**Bradley T. MOYE, Appellant,**

v.

**SIOUX CITY & NEW ORLEANS BARGE LINES, INC., Appellee.**

**No. 23018.**

United States Court of Appeals
Fifth Circuit.

Oct. 9, 1968.

Rehearing Denied Nov. 21, 1968.

Albert Sidney Johnston, Jr., Albert Sidney Johnston, III, Biloxi, Miss., for appellant.

George B. Matthews, New Orleans, La., Webb M. Mize, Gulfport, Miss., for appellee.

Before JOHN R. BROWN, Chief Judge, BELL and DYER, Circuit Judges.

DYER, Circuit Judge:

Appellant Moye, a shipyard worker employed by Saucer Marine Service, Inc. of New Orleans, sought damages against appellee Sioux City, owner of the grain barge SC&NO 1434, for personal injuries sustained in the course of his employment aboard the barge while it was undergoing repairs in Saucer's float-

ing drydock. The District Court found that there was no warranty of seaworthiness owed by Sioux City to Moye, that there was no negligence on the part of Sioux City, and entered judgment accordingly. This appeal followed. We affirm.

Barge 1434 on which Moye was injured is a covered hopper barge 195 feet in length and 35 feet in breadth. In the center is a cargo box for the storage of grain. To protect the dry cargo there are eight roll type covers, each 30 feet in width and 20 feet in length, which move on tracks fore and aft. From the deck level of the barge there is a coaming approximately three feet high which forms an upward projection of the hopper or cargo box. On each side of the coaming are the tracks for the eight roll covers. The covers peak at the center line of the barge about five feet above deck level. On either side of the barge between the coaming and the outboard side of the hull is a walkway about two feet wide. The barge was unmanned and had no motive power or lights.

As a result of two collisions the barge was in need of repairs to the side and deck plates, to some plates in the hopper, and to the No. 4 and No. 5 hatch covers. The barge was brought to Saucer's yard by an unidentified tug. No one knows whether at this time the hatch covers of the barge were open or closed. After delivery of the barge to Saucer, Sioux City had no employees or representatives present at Saucer's.

The barge went on drydock at two o'clock in the morning of March 17, 1962, and remained there until seven in the morning of March 19, 1962. It was then undocked until four in the afternoon of the same day when it was put back on the drydock and remained there until six the following morning.

Moye came to work at approximately five in the afternoon of March 19, 1962. About ten that night he boarded the barge. Eight flood lights mounted on the wing walls of the drydock illuminated the area, but "they probably did not very clearly reveal the fact that the cover on this hatch [No. 2] was partially opened." [1] Moye had a flashlight when he boarded the barge, but he apparently lost it while checking one of the rake tanks. He walked along the outboard walkway from the stern to the bow of the barge. He had been instructed to remove the gear and welding cables from the barge. Instead of remaining on the walkway to perform this task he climbed on top of the hatch covers, and in attempting to remove the cables he fell through the partially open No. 2 cover into the hopper and sustained injuries for which he sought recovery.

Moye asserts that he is the beneficiary of an absolute warranty of seaworthiness by the barge owner, Sioux City. He contends that the barge was unseaworthy because of the partially open hatch cover on the barge coupled with the inadequate flood lighting furnished by the shipyard owner, Saucer.

At least since the Osceola, 1903, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760, it has been plain that the warranty of seaworthiness owed by the shipowner to the members of its crew is a nondelegable duty, and with the advent of Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099, the doctrine was extended to longshoremen engaged in the loading and unloading of a vessel. The evolution continued in Pope & Talbot, Inc. v. Hawn, 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143; Alaska Steamship Co. v. Petterson, 1954, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 and The Tungus v. Skovgaard, 1959, 358 U.S. 588, 79 S.Ct. 503, 3 L.Ed.2d 524, in which the warranty was extended to shipyard workers doing the type of work aboard a vessel in navigation which is customarily or traditionally done by seamen, even though the workers were employed by third parties and were using equipment provided by their employer. As the Court said in United New York and New Jersey Sandy Hook Pilots Ass'n v. Halecki, 1959, 358 U.S. 613, 79 S.Ct.

1. Findings of Fact of the District Court.

517, 3 L.Ed.2d 541, "whether their calling be labeled 'stevedore,' 'carpenter,' or something else, those who did the 'type of work' traditionally done by seamen, and were thus related to the ship in the same way as seamen 'who had been or were about to go on a voyage,' were entitled to a seaworthy ship." Id. at 617, 79 S.Ct. at 519.

Moye urges that he is within the broad spectrum of the seaworthiness doctrine because his work on the barge, which had not been withdrawn from navigation, met the classic "ship's service" test. Moye claims therefore that there was a warranty of seaworthiness owed to him by Sioux City, the breach of which was the proximate cause of his injuries.

Sioux City counters that the ship's service test was not met because the barge was not designed to carry a crew, and that the type work being done by Saucer's employees and Moye in particular was not the customary work of the crew of the barge. Furthermore, Sioux City contends that the barge was not in navigation at the time because the repairs required that it be drydocked during which Saucer had complete and exclusive control of the barge at all times. Relying upon West v. United States, 1959, 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161, and Lawlor v. Socony-Vacuum Oil Co., 2 Cir. 1960, 275 F.2d 599, 84 A.L.R.2d 613, cert. denied, 1960, 363 U.S. 844, 80 S.Ct. 1614, 4 L.Ed.2d 1728, Sioux City denies that there was a warranty of seaworthiness running from it to Moye.

In *West* the ship's service test was eroded by placing the focus "upon the status of the ship, the pattern of the repairs, and the extensive nature of the work contracted to be done, rather than [upon] the specific type of work that [such] shore-based workm[a]n is doing on shipboard at the moment of [his] injury." The Supreme Court placed emphasis on control saying "Petitioner overlooks that here the respondent had no control over the vessel, or power either to supervise or to control the repair work in which petitioner was engaged. We believe this to be decisive against both

aspects of plaintiff's dual theory [of warranty of seaworthiness and negligence]." 361 U.S. at 123, 80 S.Ct. at 193. The Court also carefully pointed out that in *Hawn* and *Petterson* the vessels were "at the times of the injuries, in the hands and under the control of the owners or charterers, and, instead of undergoing general repairs, were in active maritime service in the course of loading or unloading cargo pursuant to voyages." Id. at 121, 80 S.Ct. at 192.

In *Lawlor* the Second Circuit took the position that it is no longer sufficient merely to require proof that the vessel is in navigation and that the shipyard worker is engaged in seaman's work, since *West* had made it clear that at least in some cases control of the vessel is the decisive factor. The Court concluded that "the character of the work to be done by the shipyard, the presence or absence of a crew performing the customary work of seamen on shipboard, and the consequent measure of control or lack of control by the shipyard over the vessel as a whole, are the determining factors that rule the decision of this case." 275 F.2d at 604. We adopted this reasoning in Union Barge Line Corporation v. Allen, 5 Cir. 1966, 361 F.2d 217.

█ In this case there·were no major repairs or structural changes made in the barge although the collision damage required the renewal of side plating in two places, the renewal of some deck plating and the reworking of Nos. 4 and 5 roller hatch covers. This work required the barge to be drydocked by Saucer who, from the time it received the barge until the work was completed, had exclusive control of the barge and the lighting under which the repairs were effected. The barge was designed to carry no motive power, lights or crew. Sioux City had no representative or crew aboard at any time while the barge was in Saucer's yard. Under these circumstances we hold that there was no warranty of seaworthiness by the ship owner running in favor of shore-based workers on the vessel.

Upon the complete surrender of control of the barge by Sioux City to Saucer for repairs, there was no duty owed by Sioux City to protect Moye from risks inherent in carrying out the contract. Therefore Moye's claim of negligence in failing to provide him with a safe place to work must also fail. West v. United States, supra.

Affirmed.

JOHN R. BROWN, Chief Judge (concurring):

I concur, but I would emphasize several things.

First, the fact that it is a dumb, unmanned barge, so that it never has a crew in the ordinary sense, does not obliterate the *Sieracki-Ryan-Yakus* warranties of seaworthiness to those coming aboard who do work traditionally done by seamen on a vessel that carries a crew. Thus, those who load or unload cargo on an unmanned barge are classic *Sieracki* seamen. So too would be one in Moye's position who comes aboard to make repairs. Second, the fact that it is a dumb, unmanned barge so that of necessity it is left by its towing tug in the hands of a third party who thereafter has exclusive—that is the only— physical possession and control of it does not extinguish the warranty of seaworthiness as to one in the ambiguous —amphibious seaman's status. Thus, had Moye, for example, while walking across the deck been injured from a deck plate giving way from rust, no one could push *West* so far as to deny the existence of a warranty of seaworthiness, a patent breach of it as a matter of law, a Jones Act negligent failure to maintain a safe place to work, and sure right of recovery as a *Sieracki* seaman. To the extent that Hurst v. Point Landing, Inc., E.D.La., 1962, 212 F.Supp. 160, stands for a different proposition, this Court would undoubtedly reject it as unsound.

It is a mistake, but not one made by this Court in this opinion, to read *West* as a holding that once all of the owner-charterers' employees have left the scene the warranties of seaworthiness or Jones Act statutory obligation of furnishing a safe place to work will evaporate. Rather —apart from the unique factor of a ship long withdrawn from service and the injury occurring during the process of breaking her out of lay-up status—*West* takes a sensible but very restrictive stand as to the question of control. It is not approached in a doctrinaire or exclusively physical sense. Rather, it is approached in terms of the conditions giving rise to the injury. If the circumstance bringing about the injury is a transitory condition resulting from the course of performing the contract by one who alone has the present custody and control of the vessel, then the warranty of seaworthiness— which may exist simultaneously as to these very same shore workers concerning conditions over which the operating ship owner (charterer) has a realistic physical responsibility—does not extend to such person for such condition.