**Roberta A. UGLEM, Personal Representative of Allen D. Uglem, Deceased, et al., Plaintiffs-Appellants,**

v.

**FOSS LAUNCH & TUG CO., Defendant-Appellee.**

No. 75–1775.

United States Court of Appeals, Ninth Circuit.

Sept. 13, 1976.

David Danielson (argued), of Lane, Powell, Moss & Miller, Seattle, Wash., Ronald J. Bland (argued), of Levinson, Friedman, Vhugen & Duggan, Seattle, Wash., for plaintiffs-appellants.

H. L. George Knowles (argued), of Howard, LeGros, Buchanan & Paul, Seattle, Wash., for defendant-appellee.

Before MOORE,* and DUNIWAY, Circuit Judges, and TAYLOR,** District Judge.

MOORE, Circuit Judge:

This appeal is one of the last of a vanishing breed—a "warranty of seaworthiness" suit by employees of an independent repairer contractor against a shipowner to recover damages for injuries sustained on board the shipowner's barge. The three employees, Allen D. Uglem,[1] Robert E. Olsen, and Stanley A. Olsen, worked for Todd Shipyards Corp. ("Todd" or "contractor"), an independent ship repairer.

---

\* Honorable Leonard P. Moore, United States Circuit Judge, Second Circuit, sitting by designation.

\*\* Honorable Fred M. Taylor, United States District Judge, District of Idaho, sitting by designation.

1. Allen D. Uglem died from his injuries. His personal representative, Roberta A. Uglem, brings this suit.

Todd contracted with Foss Launch & Tug Co. ("shipowner" or "Foss") to

> "Drydock vessel [Barge # 202] for inspection by ABS and USCG.
>
> Open all tanks and compts for internal exam. Provide 'safe for men' certificate. Provide temp lights. Close up upon completion of inspection. Clean & paint bottom as directed (owner furnished paint). Accomplish repairs as authorized by owner's representative."

After the implications of this directive were fully explored, the lower court determined that the contract obligated Todd to open and inspect all tanks of the barge to determine whether they were safe and to make them safe if they were not. This conclusion was not erroneous.

On March 9, 1972, Barge # 202 was taken to the Foss floating drydock where work commenced. At approximately 5:00 P.M. Todd employees removed the cover which sealed tank A421F. This tank had not been inspected or tested for oxygen content by anyone for over one year, and it had never received a protective paint coat. Sometime shortly after the cover had been removed, Stanley Olsen entered the tank to check the water level. Inside the tank the oxygen deficient atmosphere asphyxiated him and he collapsed. At 7:45 P.M. Robert E. Olsen and Allen D. Uglem attempted to rescue Stanley, but they were also asphyxiated. Uglem never recovered and the Olsens sustained severe injuries.

These employees' "warranty of seaworthiness" claim against the shipowner was abolished prospectively[2] by one of the amendments to the Longshoremen's and Harbor Workers' Compensation Act ("LHCA"). *See* 33 U.S.C. § 905(b) (Supp. 1976) *amending* 33 U.S.C. § 905. But because they suffered their injuries before November 26, 1972, the date the amendments first became effective, they purported to benefit from the pre-existing maritime law defining the "warranty of seaworthiness".

The principal issue in this appeal is whether the warranty of seaworthiness exception first adumbrated in *West v. United States,* 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161 (1959), and subsequently refined in *McDaniel v. The M/S Lisholt,* 282 F.2d 816 (2d Cir. 1960), *cert. denied* 365 U.S. 814, 81 S.Ct. 694, 5 L.Ed.2d 692 (1961),[3] is applicable. In *West* the United States contracted to reactivate a "mothballed" liberty ship. The contractor was to clean and repair all water lines, replace all missing plugs, and test all lines before closing and placing them in active operation. One of the contractor's employees was injured when a loosely fitted plug struck him after it was blown off a pipe by water flowing through the pipe. The court held that the employee could not recover from the shipowner United States. It emphasized that (1) the ship was not in the hands or under control of the owners or charterers; and (2) the ship was in the hands of the repairer for the *sole purpose of making her seaworthy*; and (3) the ship was not in maritime service.

Subsequently, the *West* holding was extended to a situation where a shore-based fireman was assigned to watch over a ship on which a fire had recently been extinguished. Although the ship remained on the high seas and the fireman's activity in no way rendered the craft more seaworthy, the Second Circuit denied the fireman recovery for injuries sustained while on board and, invoking *West,* held that there is no warranty that a vessel is seaworthy with respect to the unseaworthy condition which is directly responsible for bringing aboard

---

**2.** The 1972 amendments do not apply retroactively. *Addison v. Bulk Food Carriers, Inc.,* 489 F.2d 1041 (1st Cir. 1974); *Scalafini v. Moore McCormack Lines, Inc.,* 388 F.Supp. 897 (E.D.N.Y.1975).

**3.** The appeal had a protracted history. Originally the Second Circuit affirmed a district court judgment which had dismissed the fire-

man's claim against the shipowner. 257 F.2d 538 (2d Cir. 1958). The Supreme Court remanded the cause for a new trial, 359 U.S. 26, 79 S.Ct. 602, 3 L.Ed.2d 625 (1959), the district court complied and again dismissed the complaint, 180 F.Supp. 24 (S.D.N.Y.1959), and the circuit court affirmed that judgment.

the persons claiming the benefit of the warranty. *McDaniel, supra.*

■ Appellee shipowner argues that these cases govern this appeal and require affirmance of the lower court's judgment dismissing the appellants' complaint. Appellants contend that *McDaniel* and *West* are inapposite. Appellants argue that *McDaniel* is inapplicable because they were doing the traditional work of seamen, whereas the fireman in *McDaniel* was not. But while this rationale finds some support in the alternative holding of the first *McDaniel* opinion, 257 F.2d 538, 540, it was omitted from the later *McDaniel* opinion, and it finds no support in the *West* opinion, the case from which the *McDaniel* holding was derived. In *West,* the Court stated:

> "It would appear that the focus should be upon the status of the ship, the pattern of the repairs, and the extensive nature of the work contracted to be done, *rather than the specific type of work that each of the numerous shore-based workmen is doing on shipboard at the moment of injury." West, supra* at 122 (emphasis added).

Whether the injured employee is doing the traditional work of seamen is irrelevant.

■ A second purported distinction advanced by appellants is equally unavailing. They contend that since they were assigned by their employer solely to check the water in the tanks, only that condition can be said to be "directly responsible" for bringing them on board. Thus, they conclude that the *West* and *McDaniel* exception is confined to the unseaworthy condition of water in the tanks and that as to the unseaworthy condition of oxygen deficient air, the shipowner's warranty attaches. In view of the fact that the shipowner had absolutely no control over the vessel while it was in the hands of the repairer, such an unduly narrow view of the facts is unwarranted. It was the contract between Foss and the repairer which was the basis for the employees' work assignment, and it was that contractual undertaking which was directly responsible for them being on board. That

contract, however, did not differentiate between the various aspects of tank unseaworthiness. It encompassed them all. Consequently, the *West* exception encompasses all the various aspects of tank unseaworthiness, including oxygen deficiency. The *West* case itself confirms this conclusion. As we observed earlier, the Court directed attention to the overall picture rather than the specific type of work that each of the shore-based workmen is doing on shipboard at the moment of injury.

While there are, as is often true, factual distinctions between this case and that precedent, they are outweighed by compelling similarities. As in *West,* the shipowner had relinquished control of the barge. As in *West,* the vessel was in the hands of the contractor solely to render it seaworthy. And while we may speculate that component tasks involved in this case were fewer in number, easier to complete, and less time consuming than was true of the work required to reactivate a "mothballed" ship, this distinction to a large extent may be attributable primarily to the structural differences of the two ships rather than the scope of the contracts involved—both of which were aimed at completely eliminating all unseaworthy conditions.

Our conclusion that *West* and *McDaniel* are applicable suffices to dispose of appellants' remaining argument predicated on *Grigsby v. Coastal Marine Service,* 412 F.2d 1011 (5th Cir. 1969) *cert. denied,* 396 U.S. 1033, 90 S.Ct. 612, 24 L.Ed.2d 531 (1970). In that case, a shipowner of a barge retained an independent repair contractor to "sound the wing tanks" and "strip them out" if water was found. One of the contractor's men was asphyxiated inside the tank and collapsed during the course of the work, and a shore-based employee of the shipowner's commercial client perished from asphyxiation in an attempt to rescue the man. The court allowed the representatives of this "maritime life salver" to recover upon a warranty of seaworthiness. The court acknowledged that in light of *McDaniel, supra,* there was no warranty as

to the unseaworthy condition of water in the tanks, which condition caused the men to board the vessel. It also declined to hold that oxygen deficiency *per se* in the tanks was unseaworthy. It concluded that the unseaworthy condition was caused by the contractor's failure to take steps which were required to make tank entry safe after such entry became necessary to save the life of the employee.

In reaching its conclusion, the *Grisby* court took pains to distinguish *West, supra.* The *Grigsby* court noted that unlike *West* the barge was not in the repairer's drydock or under its control but was in the regular course of operation under a demise charterer. Indeed, the court conceded:

> "Obviously, of course, the absence of possession and control may well insulate the shipowner from a liability in personam in the absence of conduct which somehow implicates the remote owner in the deficiency.[35]"
>
> "[35] There are, of course, circumstances in which *in rem* liability will also be lacking for want of requisite control. . . . [citation omitted]"

*Grigsby, supra* at 1030–31.

■ But in our case, *West* does govern and the shipowner had absolutely no control of the vessel. Consequently, even were we to assume that it was Todd's negligent performance of its work which caused appellants' injuries, we would conclude that such fault is not attributable to the shipowner pursuant to a warranty of seaworthiness.

The LHCA was designed to extend to harbor workers within the Federal maritime jurisdiction the coverage of an administrative system comparable to state workmen's compensation laws. Indeed, LHCA was patterned after a New York state workmen's compensation statute and designed to accomplish similar goals. G. Gilmore & C. Black *The Law of Admiralty* p. 408–417, § 6–46 to § 6–49 (2d ed. 1975). In return for paying to employees a fixed rate of compensation for injuries, longshoremen employers relinquished certain defenses formerly assertable against the injured longshoremen in personal injury actions.

There was every reason to expect that the application of LHCA would result in substantial uniformity among the State and Federal programs. But the development of the longshoremen's "warranty of seaworthiness" claim against shipowners, *Seas Shipping Co. v. Sieracki,* 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), combined with development of a virtually absolute right of indemnification against the longshoreman's employer, *Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp.,* 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), led to the anomalous result that more often than not LHCA was honored in the breach. Under a "warranty of seaworthiness" injured workers could escape the limitations upon recovery imposed by LHCA by suing the shipowner, who virtually was strictly liable. The shipowner in turn had a right of indemnification from the employer of the injured worker. The net result was that the employer had to pay full damage awards far in excess of LHCA. It was primarily to restore damage limitations analogous to those imposed by a workmen's compensation system that the Act was amended in 1972. "Warranty of seaworthiness" suits against shipowners were eliminated.

That Congress has recently amended LHCA to eliminate the cause of action asserted by appellants, while certainly not dispositive, underscores the appropriateness of the decision in this case. This decision merely reflects the application of an exception to an otherwise absolute "warranty of seaworthiness". It does not deprive appellants of the compensation to which they are entitled under LHCA. It merely prevents circumvention of the Act. Since LHCA shares the same goals as state workmen's compensation laws, circumvention of LHCA by an unduly narrow construction of exceptions to the warranty of seaworthiness claim is as undesirable as circumvention of state compensation laws by other admiralty claims. *Compare, Victory Carriers Inc. v. Law,* 404 U.S. 202, 215, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971); *Ryan v. Pacific Coast Shipping Co., Liberia,* 509 F.2d 1054, 1057 (9th Cir. 1975).

# 1383

The judgment dismissing the complaint is affirmed.